**United States District Court**
**District of Massachusetts**

_____  )
                                      )
VIVIANE CORIATT-GAUBIL, VIVA,         )
INC., BRAVA, INC., NAPA, INC.         )
and ICORA, INC.,                      )
          Plaintiffs,                 )     Civil Action No.
                                      )     10-10583-NMG
          v.                          )
                                      )
ROCHE BOBOIS INTERNATIONAL, S.A.      )
and ROCHE BOBOIS U.S.A., LTD.,        )
          Defendants.                 )
_____  )

**MEMORANDUM & ORDER**

GORTON, J.

     Plaintiffs Viviane Coriatt-Gaubil ("Gaubil"), Viva, Inc.
("Viva"), Brava, Inc. ("Brava"), Napa, Inc. ("Napa") and Icora,
Inc. ("Icora") brought suit against Roche Bobois International,
S.A. ("RBI") and Roche Bobois U.S.A., Ltd. ("RB USA") for 1)
breach of fiduciary duty, 2) a declaratory judgment that a
January, 2010 document is unenforceable, 3) breach of the implied
covenant of good faith and fair dealing, 4) intentional
interference with contract, 5) violations of the Massachusetts
Consumer Protection Act, M.G.L. c. 93A, and 6) civil conspiracy.
Before the Court are three motions for preliminary injunctions.

I.   **Background**

     A.   **Factual Background**

     This dispute arises out of a breakdown in relations between

franchisor and franchisees of defendants' brand of luxury furniture.  Viva was founded in 1991 and Gaubil and RBI are both 50 percent shareholders of the company.  Each of the other plaintiffs is a wholly-owned subsidiary of Viva that operates Roche Bobois stores: Brava in Boston and Natick, Massachusetts, Napa in Estero, Florida and Icora in Coral Gables, Florida. Gaubil is the president of Viva and also sits on Viva's board of directors along with Francois Roche ("Roche"), one of RBI's founders, and Gilles Bonan ("Bonan"), RBI's chief executive officer.  She manages the day-to-day operations of the stores through franchise agreements with RB USA, a wholly-owned subsidiary of RBI.

Viva has been adversely affected by the recent economic downturn.  In 2008 and 2009, the company sustained substantial losses and, as a result, its stores were unable to pay over $500,000 in franchise fees owed to RB USA.  The defendants contend that, after Gaubil's businesses lost over $1.6 million in 2009 (significantly surpassing forecasted losses), they "realized [they] needed to play a more active role".  According to Gaubil's characterization, RBI decided

> to leverage its status as [50% owner of Viva and 100% owner of RB USA] against the economic crisis and resulting difficult financial circumstances ... to exert financial and other pressure on ... Gaubil.

In any event, in January, 2010, the parties began to discuss options.  The Natick store is apparently burdened with an

unfavorable lease under which Gaubil previously agreed to pay
one-half of the rent for which RBI is responsible.  The Boston
store is more desirable and RBI believes that it can manage its
business better than Gaubil can.  RBI has, therefore, sought to
gain control of Brava and to transfer management of the stores to
Roche's son, Antonin Roche ("Antonin").  The parties are at an
impasse.  RBI contends that Gaubil sought a deal in which RBI
would 1) pay her $250,000 for the Massachusetts stores, 2)
release her from any obligations under the Natick lease and 3)
sell its interest in the Florida stores to her.  RBI is not
interested in releasing Gaubil from her obligations under the
burdensome lease.  Gaubil similarly maintains that the parties
discussed RBI gaining control of Brava but contends that RBI
would only promise uncertain consideration to be paid in the
future.  She objected to giving up day-to-day control without
financial assurances.

In late January, 2010, Bonan traveled to Florida to meet
with Gaubil to attempt to resolve their differences.  For nearly
two days, they negotiated a deal similar to that previously
discussed.  Gaubil contends, however, that Bonan "pressured" her
to give up management and she

> came to believe that [he] would not leave until he
> achieved RBI's goal [i.e.,] to cause her to give up her
> management and equity interest for an uncertain return.

According to Gaubil, Bonan drafted a document on his laptop and

"bull[ied] and badger[ed]" her into signing it "under duress",
despite terms which were "inequitable and unreasonable".  Bonan
recounts that Gaubil "disagreed at first, but eventually
relented".  The document, signed on January 30, 2010,
contemplates that, <u>inter alia</u>:

1) management of the Brava stores would immediately
   transfer to Antonin through another RBI franchisee;

2) Gaubil would continue her involvement in the Florida
   stores; and

3) RBI would have a three-year option to purchase Gaubil's
   interest in Brava according to a formula and, if RBI
   did not exercise that option, Gaubil could cause RBI to
   sell its stock.

Gaubil quickly moved to renounce the document.  On February
1, 2010, she emailed Roche stating that Bonan's "negotiating
tactics" were inappropriate and that the document was
unenforceable.  Relations became more strained and, during a
telephone conversation later that month, Roche allegedly
threatened, for the first time, to terminate Viva's franchises.

Further efforts to resolve the dispute broke down in the
middle of March, 2010.  RBI reiterated that the January 30, 2010
document was enforceable and that if Gaubil did not agree to
relinquish control over the Brava stores, it would cause RB USA
to issue notices of termination of the franchises for unpaid
fees.  Gaubil claims that threat was improper because 1) it was
the first mention of the alleged default and 2) RBI knew that
Viva was due to receive a substantial tax refund with which it

could pay the overdue franchise fees.[1]  Gaubil instead proposed
that she and RBI, as joint shareholders, loan Viva an amount
sufficient to pay the delinquent fees but that discussion also
ended without agreement.

Gaubil refused to relinquish management control or her
interest in the Brava stores according to RBI's terms whereupon
RBI made good on its threat, causing RB USA to issue notices of
termination on April 5, 2010.  Pursuant to the agreement, the
franchisee had five days to cure the defects to avoid termination
which, in turn, carried severe consequences.  Those included
obligations 1) to pay back the owed fees, 2) to remove from their
stores any sign of the Roche Bobois brand, 3) to return
confidential information, 4) to relinquish all customer lists and
5) to refrain from operating a competing entity for two years.

RBI has subsequently considered gaining control of Brava
through corporate votes.  Because Roche and Bonan constitute a
majority of Viva's board of directors, they proceeded to call a
meeting of the board for the alleged purpose of ousting Gaubil
from her office.  That meeting was postponed in anticipation of a
forthcoming decision on the pending motions.

In any event, Gaubil alleges that she will suffer
irreparable harm.  The crux of her complaint is that RBI is

---

[1]  The amount of the expected refund is unclear, having been
represented as $491,000 in the papers but adding up to $498,000
according to figures reported at oral argument.

attempting, in bad faith, to expel her from management of the
Massachusetts stores for little or no consideration which, in
turn, will deprive her of her right to earn a living, preclude
her from the only industry (and brand) she knows and effectively
strip her of her equitable interest in the subject companies.
Plaintiffs have brought suit seeking to block that result.

### B.   Procedural History

On April 9, 2010, the plaintiffs filed their complaint and
two motions for temporary restraining orders in the Massachusetts
Superior Court Department for Suffolk County.  Defendants
promptly removed the case to this Court.  In light of the
integrated nature of the several disputes, the parties entered
into a stipulation to maintain the status quo temporarily.

Unable to resolve their differences, plaintiffs filed three
extensive motions for injunctive relief on April 22 and 23, 2010.
Defendants filed a single opposition and two affidavits one week
later to which plaintiffs have sought to file a reply.  A hearing
was held on the motions on May 6, 2010.

## II.  Analysis

### A.   Legal Standard

To be entitled to preliminary injunctive relief, a movant
must demonstrate

> (1) a substantial likelihood of success on the merits,
> (2) a significant risk of irreparable harm if the
> injunction is withheld, (3) a favorable balance of
> hardships, and (4) a fit (or lack of friction) between

the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted).  Likelihood of success on the merits is the critical factor in the analysis.  Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993) (citations omitted).

**B.   Application**

Plaintiffs have filed three motions: 1) Gaubil's motion to enjoin RBI from removing her as director, president and manager of the corporate plaintiffs, 2) Gaubil's motion to enjoin defendants from terminating the franchise agreements and 3) the motion of Viva, Brava, Napa and Icora to enjoin defendants from terminating their franchise agreements.  Although two of the motions pertain to the franchise agreements, they are based upon different causes of action and are therefore considered separately.

**1.   Gaubil's Motion to Enjoin Her Removal from Office and the Termination of Her Employment**

Gaubil seeks to enjoin RBI from removing her as director, president and manager of the corporate plaintiffs in alleged violation of its fiduciary duty of good faith and loyalty to a shareholder in a closely held corporation.

**a.   Likelihood of Success**

Under Massachusetts law, a claim based upon the duty of good faith and loyalty owed to shareholders in a closely held corporation is analyzed in two steps.  First, the court examines

-7-

whether the defendants can demonstrate a legitimate business purpose for their conduct, keeping in mind that a controlling group "must have some room to maneuver in establishing the business policy of the corporation". <u>Wilkes</u> v. <u>Springside Nursing Home, Inc.</u>, 353 N.E.2d 657, 663 (Mass. 1976). That room to maneuver includes discretion, which may even be exercised for self-interest, with respect to setting the salaries of corporate officers, dismissing directors with or without cause and hiring and firing corporate employees. <u>Id.</u> If a legitimate purpose is shown, plaintiffs must demonstrate that the same objective could have been achieved in a manner less harmful to their interests. <u>Id.</u>

Gaubil contends that terminating her employment is precluded by <u>Wilkes</u> and its progeny. She notes that Viva and its subsidiaries have typically distributed earnings to her as a shareholder in the form of her salary. Accordingly, her termination would arguably deprive her of all financial benefit as a shareholder and of her reasonable expectation of continued employment. Moreover, she maintains, no legitimate business purpose exists and Viva's adverse financial condition is mere pretext. She claims that the stores were beginning to recover from the economic downturn and thus her retention was warranted. Finally, she asserts that RBI's conduct in securing full management control and ultimately causing Viva to become an

"empty shell" cannot be considered a permissible discretionary decision.

RBI responds that Gaubil has not established a contractual or legal right to continued employment and that any fiduciary duty does not preclude a shareholder from acting in the best interests of the corporation, even to the detriment of another shareholder.  First, RBI asserts that Massachusetts law does not prohibit a closely held corporation from terminating the employment of a shareholder who has no contractual right thereto.

In any event, defendants contend, their proposed conduct clearly survives scrutiny under Wilkes.  Their legitimate business purpose is, purportedly, to change the direction of management at the stores because 1) Gaubil has not accurately reported operating results, 2) the stores have been performing poorly and 3) defendants believe that another manager could do better.  Because Gaubil cannot point to a less harmful way to achieve that legitimately-sought change, she is unlikely to succeed.

Defendants have a more persuasive argument.  There is no evidence that defendants' original goal of seeking a change in the management direction of the Massachusetts stores was illegitimate, retaliatory or pretextual.  Negotiation was unsuccessful and, as a result, defendants are entitled to resort to the corporate procedures that the parties agreed to when they

incorporated Viva and its subsidiaries.  Despite her disagreement
with the restructuring, Gaubil has not established that
subsequent events leave her likely to succeed in barring
defendants from their desire to change management.

### b.    Irreparable Harm

Furthermore, Gaubil's claim of irreparable harm is entirely
too speculative.  Under her account, RBI's plan is to remove all
of her control over Viva and its subsidiaries, eliminate her
compensation (both salary and dividends) and effectively render
her equity interest valueless with "no meaningful way to realize
a financial benefit ... or to extract her financial interest".
There is no reason to believe, however, that her parade of
horribles is likely.  Looking at the big picture, it is apparent
that this entire dispute arose out of defendants' desire to
regain control of the Massachusetts stores only.  They did not
seek to strip Gaubil of her authority with respect to the Florida
stores which Viva still owns.  Whether they have changed course
as a result of this litigation is unclear.

In any event, permissibly removing Gaubil from overall
authority in Viva does not automatically mean that her entire
financial interest as a shareholder will be adversely affected.
If she has been compensated by salary in the past, that
arrangement can be altered to compensate her in another way
(including by salary if she continues to manage the Florida

stores).  In a sworn affidavit, Bonan concedes that the law
protects Gaubil from being deprived of a reasonable return on her
shares and her speculation to the contrary is unfounded.

The only anticipated harm, therefore, is the loss of
Gaubil's continued employment with respect to some or all of
Viva's stores.  Although she clearly protests her termination in
that regard and losing one's job can obviously be harmful, Gaubil
has not established a cognizable, irreparable harm that cannot be
compensated by damages should she ultimately prevail.  Her motion
for a preliminary injunction will, therefore, be denied.

### 2.   Gaubil's Motion with Respect to the Franchise Agreements

#### a.   Likelihood of Success on the Merits

Gaubil contends that, by terminating the franchise
agreements, RBI will breach its duty of good faith and loyalty to
her as a joint (but "weaker") shareholder in Viva, a closely held
corporation.  In particular, Gaubil asserts that RBI is
"unmistakably acting in its own self-interest and in derogation
of its duties" because termination of the franchises will 1)
effectively provide RBI with complete control of Viva and its
subsidiaries and 2) be done solely in retaliation for Gaubil's
refusal to acknowledge the January 30, 2010 document.  Gaubil
speculates that, upon termination, RBI will re-issue the
franchises for its own benefit, leaving Gaubil and Viva saddled
with liabilities and no way to satisfy them.  As further evidence

-11-

of RBI's "scheme", Gaubil points to the fact that termination
notices were issued despite RBI's knowledge that the past due
franchise fees could be paid soon with a large tax refund.  In
short, she labels defendants' conduct a "classic freeze-out" by a
majority stockholder.

Moreover, Gaubil argues that RBI's actions are unjustified
under Wilkes.  First, she maintains that, because terminating the
franchises would adversely effect all of the corporate
plaintiffs, RBI cannot be acting with any legitimate business
purpose in the interest of those companies as a Viva shareholder.
Second, Gaubil asserts that RBI's proposal to terminate the
franchises cannot possibly constitute a permissible discretionary
decision.

RBI responds by emphasizing what Gaubil does not allege,
i.e., that defendants do not have a legal right to terminate the
franchises or that she will pay the delinquent fees in the
immediate future.  Instead, defendants contend, Gaubil has
concocted a far-fetched

> scheme [that is] nothing but a fantasy seized upon ... to
> avoid the straightforward legal consequences arising from
> their failure to pay ... as required.

Although defendants advance numerous other arguments to
rebut Gaubil's, the Court need not consider them.  Gaubil has not
established a likelihood of success on the merits in light of the
agreed-upon terms of the franchise agreements.  Critically, she

fails to provide persuasive authority for the proposition that enforcing (or causing to be enforced) uncontested, bargained-for contractual rights such as those contained in the franchise agreements can constitute a breach of fiduciary duty.  Indeed, even if RBI has singled out Gaubil's franchises, which is not clear, there is no "selective enforcement" rule to govern a private party's contractual rights.  Plaintiffs also concede that the defendants have not waived their franchise agreement rights by waiting to enforce them.

By analogy, it is well-settled that stockholders in closely held corporations can enter into contracts regarding their fiduciary duties and that those duties then yield to such contracts.  E.g., Fronk v. Fowler, 923 N.E.2d 503, 515-16 (Mass. 2010).  Here, even assuming that RBI's duty as a Viva shareholder extends to its control of RB USA, the plaintiffs entered into franchise agreements that governed a portion of the relationship between themselves and RBI.  Those agreements trump any fiduciary duty claims, especially with respect to consideration of a motion for preliminary injunction where it is plaintiffs' burden to show that their success is not just possible, but likely.

To be sure, RBI is in a somewhat peculiar position because it controls the franchisor, RB USA, and is also a 50% Viva shareholder.  Nonetheless, RBI apparently has determined, as such a shareholder and in its own right, that it is in the best

interests of the Massachusetts stores to change management.  That
is a legitimate business decision.  Gaubil cites no authority for
proposition that RBI must set aside both its legitimate plan to
appoint a new manager and its admitted contractual right to
collect overdue franchise fees in order to perpetuate Gaubil's
tenure in office.  Gaubil has not, therefore, established a
likelihood of success on the merits.

### b.   Irreparable Harm and Balance of Harms

Gaubil contends that she faces severe harm absent an
injunction.  She alleges that her equity interest in the
corporate plaintiffs operating the franchises will be valueless,
she will be deprived of corporate office and employment in the
only industry she knows and she will lose her income and
reputation.  She asserts, moreover, that money damages cannot
remedy the problem because the wrongful conduct threatens the
very existence of a business.  With respect to the balance of
harms, she maintains that defendants face minimal risk in light
of the fact that their fees will be paid soon (by virtue of tax
refund) and the risk to her is catastrophic.

Defendants respond that the potential harm to Gaubil is not
irreparable because damages are not speculative and, once
measured, could provide adequate relief.  Not surprisingly,
defendants also view the balance of harms in their favor.  They
argue that Gaubil is attempting to usurp their right to enforce

-14-

valid contracts and that any harm from enforcement was
predestined by the previously agreed-to terms.  An injunction,
defendants assert, would deprive them of their contractual rights
and give the franchisees an excuse not to pay without
repercussions.

Although several of her contentions are speculative, Gaubil
has the better argument and she risks considerable harm,
including the imposition of a two-year, non-compete clause.  That
potential harm is not, however, enough to outweigh her
unlikelihood of success, see Weaver, 984 F.2d at 12; Am. Century
Home Fabrics, Inc. v. Ashley Furniture Indus., 473 F. Supp. 2d
168, 175 (D. Mass. 2007), and Gaubil's motion will, therefore, be
denied.

### 3.   The Corporate Plaintiffs' Motion

The corporate plaintiffs seek to enjoin defendants from 1)
terminating the franchise agreements and 2) interfering with
their relationships with customers and suppliers.

### a.   Likelihood of Success

The corporate plaintiffs bring claims for 1) breach of the
implied covenant of good faith and fair dealing with respect to
the franchise agreements, 2) intentional interference with
contractual relations with suppliers and customers, 3) violation
of M.G.L. c. 93A and 4) civil conspiracy.  The latter three
claims cover the same subject and are thus considered together.

### i.   The Implied Covenant

New York law governs the franchise agreements.  There, the implied covenant of good faith and fair dealing prohibits a party from intentionally and purposely doing anything to prevent another party from carrying out the agreement on his part.  E.g., Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991).  Contractual discretion, moreover, is bounded by the obligation to act in good faith.  Id. at 231.

Plaintiffs contend that RB USA breached the implied covenant of good faith and fair dealing by noticing the termination of the franchise agreements.  Plaintiffs assert that this was done in bad faith in an attempt to coerce additional financial information from Gaubil despite defendants' awareness that delinquent fees would be paid upon receipt of a tax refund.

Although defendants do not respond directly to this argument, plaintiffs have not established a likelihood of success on the merits.  It is not surprising that they cite no authority for the untenable proposition that a party can breach a contract's implied covenant of good faith and fair dealing by seeking to enforce the plain terms of that contract.  See Phoenix Capital Invs. LLC v. Ellington Mgmt. Group, L.L.C., 859 N.Y.S.2d 46, 48 (App. Div. 2008) (noting the well-established principle that the implied covenant of good faith and fair dealing will be enforced only to the extent it is consistent with the provisions

of the contract).

### ii. Interference with Contractual Relations

Plaintiffs' remaining claims contend that defendants have improperly interfered with their contractual relations with suppliers and customers in order to coerce concessions from Gaubil.  With respect to suppliers, plaintiffs allege that, although Viva remains on good terms with them, RBI has contacted a major supplier and demanded that it not ship product to Viva unless plaintiffs pay in advance, which they were not previously required to do.  Plaintiffs do not elaborate on whether or how requiring advance payment interferes with their supply contracts nor whether that requirement has actually prevented any shipments.

With respect to their customers, plaintiffs claim that termination of the franchise agreements will make it impossible to honor their contractual obligations.  Plaintiffs do not explain what those obligations are and, again, cite no authority for their proposition.

Defendants call plaintiffs' argument a red herring.  They maintain (strangely) that terminating the franchises will not disturb plaintiffs' relations with their customers because luxury furniture customers are not generally repeat buyers with an ongoing relationship.  In any case, defendants argue that, as worldwide owners of the Roche Bobois brand, they are uniquely

capable of maintaining plaintiffs' relationships with suppliers and customers.

Although the uncertain effect of franchise terminations upon plaintiffs' purported outstanding contractual obligations is somewhat disconcerting, the plaintiffs bear the burden of proof on a motion for a preliminary injunction and here they have failed to meet it.  In particular, the dearth of authority cited in support of their contention forecloses a finding that they have established a likelihood of success on the merits.

### b.   Irreparable Harm

Plaintiffs advance no fewer than five examples of irreparable harm which are uncontested by the defendants.  Even if accepted as true, however, the failure of the corporate plaintiffs to demonstrate a likelihood of success is dispositive of their motion.  See Weaver, 984 F.2d at 12.

### 4.   Summary

Ultimately, the disposition of these motions was predetermined before this dispute arose.  The arrangements set up between the parties provide for 1) uncontested rights when franchise fees are in default and 2) only circumscribed control by Gaubil over Viva and its subsidiaries.  It is, to be sure, unfortunate that defendants' desire to move the Massachusetts stores in another direction has spiraled to this point but the ultimate resolution of the dispute is for another day.  For the

time being, plaintiffs' motions for injunctive relief will be denied.

## ORDER

In accordance with the foregoing, plaintiffs' motions for a preliminary injunction (Docket Nos. 4, 6 & 8) are **DENIED**.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated May 18, 2010