UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10583-NMG

|  |  |
|---|---|
| VIVIANE CORIATT-GAUBIL, <br>       Plaintiff, <br><br>    v. <br><br> ROCHE BOBOIS INTERNATIONAL, <br> S.A. and ROCHE BOBOIS, U.S.A., LTD., <br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**SECOND AMENDED VERIFIED COMPLAINT**
**[LEAVE TO FILE GRANTED ON NOVEMBER 17, 2010]**

INTRODUCTION

Plaintiff, Viviane Coriatt-Gaubil, brings this action against Defendant, Roche Bobois

International, S.A., seeking damages for RBI's breach of fiduciary duty, breach of contract,

breach of the implied covenant of good faith and fair dealing and a declaration pursuant to

M.G.L. c. 231A, § 1 that a document signed by the parties on January 30, 2010, is void and/or

voidable, and otherwise unenforceable.  Plaintiff also seeks a declaration against both

Defendants pursuant to M.G.L. c. 231A, § 1 that restrictive covenants contained in one or more

franchise agreements are void and unenforceable.  Plaintiff further seeks equitable injunctive

relief to restrain RBI from causing its wholly owned subsidiary, Roche Bobois, U.S.A., Ltd., to

terminate one or more franchise agreements governing the operations of certain Roche Bobois

furniture stores in Massachusetts and Florida.

**PARTIES**

1.      Plaintiff, Viviane Coriatt-Gaubil ["Ms. Gaubil"], is an individual with a place of

residence at 100 Captains Row, Apt. 207, Chelsea, Suffolk County, Massachusetts.

2.      Defendant, Roche Bobois International, S.A. is a French corporation having an address of 18 Rue de Lyon, 75012, Paris, France ["RBI"].  RBI, through its wholly owned subsidiary RB USA, is the franchisor of the brand "Roche Bobois."

3.      Defendant Roche Bobois USA, Ltd. ["RB USA"] is a New York corporation having a principal place of business at 183 Madison Avenue, New York, New York.  RB USA is the wholly owned subsidiary of RBI, and is the franchisor of the brand "Roche Bobois" in the United States, Canada, and Mexico.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and the United States Constitution.

5.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a).

## FACTS

### Corporate Structure and Ownership Interests of the Various Entities

6.      Ms. Gaubil and RBI are each respectively owners of fifty percent (50%) of the outstanding shares of stock in Viva, Inc., a Massachusetts corporation formed in April 1991 as Viva Acquisition, Inc.  In May 1991, Viva Acquisition, Inc. filed Articles of Amendment, changing its name to Viva, Inc. ["Viva"].

7.      Viva is a closely held corporation.

8.      From the date of its organization in 1991 until May 18, 2010, Ms. Gaubil was Viva's President.  François Roche, one of the founders of the Roche Bobois brand, the former CEO of RBI and the current Chairman of the Board of Supervisors of RBI ["Mr. Roche"], has been Viva's Treasurer since February 2007.  Ms. Gaubil, Mr. Roche and RBI's current CEO, Gilles Bonan ["Mr. Bonan"], are all of the directors of Viva.

9.    On or about May 31, 1991, Viva was granted a Roche Bobois franchise by RB USA and entered into a related Dealership Agreement [the "Massachusetts Franchise Agreement"].  RBI and Ms. Gaubil are also parties to the Massachusetts Franchise Agreement.

10.    The Massachusetts Franchise Agreement was entered into on the express representation that, during the term of the Agreement, as modified or extended from time to time, Ms. Gaubil "shall have full managerial authority and responsibility for the operating management of the Dealer [Viva] in the performance of this Agreement."  It was also expressly represented in the Agreement that Ms. Gaubil held the positions of President and Treasurer of Viva.

11.    Brava, Inc., a Massachusetts corporation ["Brava"], was formed in January 2005 to engage in the business then operated by Viva in Boston [the "Massachusetts Business"].  Pursuant to an Asset Contribution Agreement ["Asset Contribution Agreement"] signed in 2005, Viva transferred the Massachusetts Business to Brava in exchange for all of the outstanding shares of Brava.  The Asset Contribution Agreement is governed by and interpreted under Massachusetts law.

12.    The Massachusetts Franchise Agreement was part of the Massachusetts Business transferred from Viva to Brava in 2005.

13.    From the date of Brava's formation in January 1995 until June 1, 2010, Ms. Gaubil was President of Brava.  Ms. Gaubil and Messrs. Roche and Bonan are all of the directors of Brava.  For the period relevant to this Complaint, Ms. Gaubil has managed the day-to-day operations of the Massachusetts stores.

14.    A Roche Bobois franchise was granted to Napa, Inc. ["Napa"], a wholly-owned subsidiary of Viva and a Florida corporation, on or about May 1, 2001, pursuant to a Franchise

Agreement between RB USA, Napa, and Viva. The Napa Franchise Agreement was entered into on the express representation that Ms. Gaubil, President of Napa, "shall have full managerial authority and responsibility for the operating management of the Dealer in the performance of this Agreement" "during the term of this Agreement, as modified or extended from time to time."

15.    A Roche Bobois franchise was also granted to Icora, Inc. ["Icora"], a wholly-owned subsidiary of Viva formed in 1997 and a Florida corporation, on similar terms and representations as the franchises granted to Viva and Napa.

16.    Ms. Gaubil held the position of President of Napa and Icora [collectively "the Florida Entities"] from the dates of their respective formations until June 1, 2010. For the period relevant to this Complaint, Ms. Gaubil has managed the day-to-day operations of the Florida stores.

17.    RBI has participated in the management and operations of Viva and Brava, and, specifically, the Natick and Boston stores, as well as the management and operations of the Florida stores, regularly over the years.

18.    In August 2005, RBI executed a Lease Guaranty in connection with a ten-year commercial real estate lease issued to Brava for its Natick store, guaranteeing the payment of more than $1,890,000 in rent by Brava over the term of the lease. In addition, in December of 2009, RBI issued its Letter of Credit to secure the amendment to the Boston Lease. Ms. Gaubil also guaranteed the lease and the letter of credit.

19.    Since 2005, RBI's agents, including without limitation Mr. Bonan, and RBI's Director of International Development, Martin Gleize ["Mr. Gleize"] (also Viva's Secretary and Clerk), have traveled to Massachusetts and Florida three or more times per year to visit the

stores, review and audit the books and financial statements and other documents for those businesses, and to participate in management meetings regarding the operations of the Massachusetts and Florida stores. RBI has been actively involved regarding the interior design of the stores, the products sold, business arrangements and negotiations with suppliers, decisions regarding expense reduction and actions to be taken by Viva's accountants, for itself and its subsidiaries, and further investment of capital and/or loans to address difficult economic times for all of the stores.

20.     In exchange for its active management services to Viva and its subsidiaries, RBI receives a management fee in addition to any shareholder distributions.

21.     Pursuant to their respective Franchise Agreements, Brava, on behalf of the Natick and Boston stores, and the Florida Entities are required to pay certain franchise fees to RBI's wholly-owned subsidiary, RB USA. RB USA is the franchisor of the brand "Roche Bobois" in the United States, Canada and Mexico. These fees inure directly and completely to the benefit of RBI.

22.     Ms. Gaubil and RBI are also owners of another entity, Diva D.C., Inc. ["Diva"], which operates a high-end market furniture store under the Roche Bobois name in the Washington, D.C. area.

23.     Diva is a Delaware corporation incorporated on or about April 16, 1996. RBI owns 50% of Diva. Ms. Gaubil owns 20%, Henri Gaubil owns 20% and David Zein owns 10%. Until September 30, 2010, the Board of Directors consisted of Ms. Gaubil, Mr. Roche, and Mr. Bonan. Ms. Gaubil was also the President of Diva.

24.     A Roche Bobois franchise was granted to Diva on June 15, 1996 on similar terms and representations as the ones granted to Viva and Napa.

25.    Ms. Gaubil, Mr. Gaubil (who is Ms. Gaubil's husband), and Mr. Zein (who is Ms. Gaubil's son) were responsible for the day-to-day operations of the franchise in the D.C. area.

26.    RBI has also participated in the management and operations of Diva, as well as the management and operations of the store itself.  RBI's involvement with Diva has included, among other things: travel by RBI's agents to the store; review and audit of the books, financial statements, and other documents; and participation in management meetings regarding the operations of the store.  RBI has been actively involved in the interior design of the store, the products sold, and business arrangements and negotiations with suppliers.

27.    Diva has operated successfully and has been generally profitable.

The Economic Downturn and
Financial Difficulties of the Massachusetts and Florida Stores

28.    Since Viva's formation in 1991, and under Ms. Gaubil's stewardship as President, Viva has had success building the Roche Bobois brand in Massachusetts and Florida, and Viva has generally been very profitable.

29.    As a consequence of the generally recognized worst economic downturn since the Great Depression of 1929, including the collapse of the luxury furniture market, Viva and its subsidiaries realized only a relatively nominal net income in 2008 and a substantial net loss in 2009.  Despite Ms. Gaubil deferring substantial salary and RBI making a loan of $100,000 in May 2009 to Brava, Brava and the Florida Entities were able only to pay certain of the franchise fees in both 2008 and 2009.

30.    During 2008 and 2009, Ms. Gaubil kept RBI apprised of the financial difficulties experienced by the Massachusetts and Florida stores as a consequence of the economic downturn.

31.    At no point during 2008 or 2009 did RBI or RB USA take any action or express

an intention to take action under any of the Franchise Agreements relative to the unpaid fees.

32.    In fact, and notwithstanding the balance due, upon making an installment of

franchise fees to RB USA in calendar year 2009, Ms. Gaubil was advised by RB USA's Vice-

President that she is "the only one who pays", referring not just to Viva and its subsidiaries but

relative to RB USA's other franchises in the system (including those 100% owned by RBI in

New York).

In the Context of a Viva Shareholder Disagreement,
RBI Wrongfully Attempts to Leverage the Economic Crisis
and Financial Difficulties of the Massachusetts and Florida Stores

33.    In January 2010, RBI, in its capacity as a Viva shareholder, began to leverage the

economic crisis and resulting difficult financial circumstances experienced by the Massachusetts

and Florida stores to exert financial and other pressure upon Ms. Gaubil in an attempt to cause

her to relinquish management of Brava to RBI and to construct a mechanism for the transfer of

her equity interest in Brava to RBI.  This effort was consistent with RBI's expressed desire that

Brava be managed by the same RBI-run entity that manages franchises in New York and

Philadelphia.  Specifically, Ms. Gaubil and RBI began discussing possible alternatives for Ms.

Gaubil's transfer of her interest in Brava to RBI, including without limitation the potential for an

"exchange" of Ms. Gaubil's interest in the Massachusetts stores for RBI's interest in the Florida

stores, with an appropriate monetary adjustment.

34.    Throughout January 2010, RBI, in its capacity as shareholder of Viva, advocated

for a change in ownership structure and management of Brava and Viva that would involve

RBI's management, through an RBI-owned franchisee, of Brava, with Ms. Gaubil's shares in

Brava (which were to spin out of Viva) to be transferred to RBI at some indefinite, future date at

RBI's option, for uncertain consideration.  Ms. Gaubil expressed her significant concern with and opposition to this proposal, and, specifically, with the suggestion that she give up day-to-day management of Brava with no assurance of receipt of any consideration for her interest should RBI exercise its purchase option.

35.    On January 29, 2010, Mr. Bonan, as CEO of Viva shareholder RBI, traveled to Coral Gables, Florida, where Ms. Gaubil also owns a home, to meet with Ms. Gaubil and to advance RBI's agenda to secure control of Brava.

36.    Most of the afternoon on January 29, 2010, and virtually all day on January 30, 2010, Mr. Bonan, as agent for shareholder RBI, pressured Ms. Gaubil to give up her management of Brava (and the Massachusetts stores) to Antonin Roche, son of Francois Roche, and to transfer her equity interest in Brava to RBI.  Ultimately, on January 30, 2010, Ms. Gaubil did not believe that Mr. Bonan would leave until he had achieved RBI's goal – to cause her to give up her management and equity interest for an uncertain return.  In fact, despite Ms. Gaubil's expressed disagreement with RBI's proposal, Mr. Bonan began drafting a document on his laptop in her home, bullying and badgering her into signing a document containing terms which were entirely inequitable and unreasonable for Ms. Gaubil.  Ms. Gaubil signed the document under duress, but only after inserting language which made it clear that the document was not a complete contract.

37.    The document signed on January 30, 2010 was drafted in French and contemplated that an agreement would be prepared memorializing the following provisions, but expressly contingent on "reiterat[ion] in English by an American attorney chosen jointly by [Ms. Gaubil] and RBI in February 2010.  Said attorney will make sure the provisions of this agreement comply with the American laws in effect . . . and must restore the letter and the spirit

of this agreement, while preserving the interests of the stockholders from a legal and fiscal standpoint." This document contemplated the following:

a. management of the two Brava stores would immediately be transferred to Antonin Roche, Mr. Roche's son, through another RBI entity, Tonymo, Inc. (operated out of New York) for which Tonymo, Inc. would be paid $30,000/per year, together with 1% of gross sales generated by those stores;

b. Antonin Roche would report to Bonan and would have signatory authority over Brava's accounts; Ms. Gaubil would have no authority with respect to the operations of the Boston and Natick stores;

c. Although Ms. Gaubil would be permitted to have continued involvement in the management of the Florida stores, she would be required to involve Antonin Roche in all decisions regarding communications, pricing and sales policies for those stores; and

d. RBI, in its sole discretion, would have a three year option to purchase Ms. Gaubil's equity interest in Brava according to a vague and generally incomprehensible formula, and, if RBI declines to purchase the stock, Ms. Gaubil would have the right to cause RBI to sell all of the Brava stock to a third party, a rather useless right considering that if RBI did not support such a sale, no third party would be willing to pay fair value.

A copy of the document signed on January 30, 2010 [the "January 30 Document"] and a Certified Translation of the Document are attached hereto and incorporated herein as Exhibit "A," at pages 2-4 and 14-16.

38.    On February 1, 2010, Ms. Gaubil sent an email to Mr. Roche, expressing her concern regarding Bonan's negotiating tactics and disavowing that the January 30 Document was enforceable.  A copy of the February 1, 2010 email from Ms. Gaubil to Mr. Roche, both in its original form and as translated, is attached at Exhibit A at pages 6-7 and 18-19.

39.    In or about the last week of February 2010, in a telephone conversation between Mr. Roche and Ms. Gaubil, Mr. Roche, as agent for shareholder RBI, threatened that RBI would cause RB USA to terminate the Viva franchises if she did not agree to RBI's entirely one-sided proposal and to installing his son as manager of the Massachusetts stores.  Mr. Roche said expressly, "I will remove the franchise from you.  It is mine."

40.    Thereafter, Ms. Gaubil and Mr. Roche did continue to communicate about alternative ways to resolve their differences as shareholders of Viva.  Emails were exchanged between Ms. Gaubil and Mr. Roche through March 14, 2010, and efforts were made to negotiate the terms of a shareholder agreement by which Ms. Gaubil's interest in the Boston stores would be transferred to RBI in an equitable manner and for fair consideration.  Negotiations for this Viva shareholder agreement broke down on or about March 14, 2010, and RBI involved its counsel.

After Negotiations Regarding a Viva Shareholder Agreement
Broke Down Between RBI and Ms. Gaubil,
RBI Again Wrongfully Threatened to Cause Termination of the Franchise Agreements

41.    Beginning on March 16, 2010, after negotiations regarding a shareholder buyout transaction broke down, RBI in its capacity as a shareholder of Viva, through its counsel, asserted that the January 30 Document is an enforceable agreement with respect to Viva shareholder matters.  In order to coerce Ms. Gaubil to comply with its terms, RBI, in its capacity as a shareholder of Viva, threatened that whether the January 30 Document was enforceable or

not, if Ms. Gaubil did not comply with its terms, RBI would cause RB USA to issue notices of termination pursuant to the Franchise Agreements for failure to pay franchise fees.  The effect of such termination would cause RBI to gain 100% control of all of the Massachusetts and Florida stores, rendering Viva's and its subsidiaries assets virtually worthless and Ms. Gaubil's interest in Viva virtually worthless.

42.     Prior to this shareholder disagreement, neither RBI nor RB USA ever threatened termination for failure to pay franchise fees in their capacity as franchisor to Viva and its subsidiaries.

43.     Despite the fact that the Massachusetts and Florida stores had been unable to pay the total amount of franchise fees set forth in the Franchise Agreements since 2008, no mention of issuance of a notice of termination for non-payment of franchise fees was made to Ms. Gaubil until after RBI, in its capacity as a shareholder of Viva, attempted to cause Ms. Gaubil to transfer her interest in Brava to RBI for little or no consideration.

44.     On information and belief, most or all of the Roche Bobois franchisees are in arrears of their franchise fees, and RB USA has not taken uniform action against most similarly situated Roche Bobois franchisees for non-payment of franchise fees.

45.     Moreover, RBI made this threat to terminate the franchise fees knowing that within several weeks, Viva and its subsidiaries expected to receive an income tax refund in the amount of up to $480,000.  This refund, which could be applied to payment of the franchise fees, and together with available company funds (resulting from strong sales in the last few months), would allow Viva and its subsidiaries to pay all outstanding franchise fees in the near future.  Upon information and belief, Viva and its subsidiaries would then be RB USA's only franchise

in the United States that was not in arrears on its franchise fees (including those 100% owned by

RBI in New York).

46.    In response to RBI's threat, on March 22, 2010, Ms. Gaubil in her capacity as

President of Viva, sent a letter to RBI advising that if RB USA did in fact send a notice of

default, she would recommend that both RBI and she, as Viva's other shareholder, provide loans

to Viva for any amount in franchise fees that Viva was unable to pay so that the franchise fees

could be paid.  A copy of Ms. Gaubil's March 22 correspondence is attached hereto and

incorporated herein as Exhibit "B."

47.    RBI, in its capacity as a shareholder of Viva, responded on March 25, 2010,

among other things (i) rejecting the possibility of an "exchange" of interests between the parties;

(ii) suggesting that the amounts proposed by Ms. Gaubil be paid to the parties as equity

contributions to Viva, and not loans (which would result in the immediate payment to RBI,

through RB USA, of the alleged "equity contribution," with the net result that RBI would

immediately be made whole); (iii) demanding immediate relinquishment by Ms. Gaubil of

management of Brava; and (iv) requiring that the income tax refund due to Viva, about which

RBI had been recently advised, be used to pay RBI's exclusive suppliers (which would also

result in a payment to RBI in the nature of a commission).

48.    On or about March 31, 2010, Ms. Gaubil rejected much of RBI's March 25, 2010

proposal on the grounds that the terms unfairly benefited RBI in its capacity as a shareholder of

Viva and were not in Viva's best interests.

49.    On or about April 1, 2010, through its counsel, RBI indicated that if Ms. Gaubil

refused to relinquish management of Brava, then RBI, in its capacity as a shareholder of Viva,

would make no further investment of funds (whether in the form of loan or equity) in Viva and RBI would cause RB USA to "proceed accordingly."

50.     Ms. Gaubil continued to refuse to relinquish management of and transfer her interest in the Boston stores to RBI for little or no consideration.

51.     Thereafter, on April 5, 2010, RBI caused RB USA to issue notices of termination of the Massachusetts Franchise Agreement and the Napa Franchise Agreement.  Pursuant to the Franchise Agreements, Brava and Napa had five (5) calendar days after proper notice of termination to cure deficiencies under the Franchise Agreements, otherwise the Agreements and franchises are terminated.

52.     Upon information and belief, a termination notice of the Icora Franchise Agreement was sent to Icora at an address which the store operated by Icora has not occupied since July 1, 2009 – a fact known to RBI and RB USA.  Icora had not received proper notice of termination of the Icora Franchise Agreement.

53.     Upon termination under the Massachusetts, Napa and Icora Franchise Agreements, the former franchises have certain debts and obligations, including the following:

     a.     pay to RB USA all franchise fees;

     b.     remove any Roche Bobois signs, cease all advertising, and return all confidential information;

     c.     deliver complete lists of names and addresses of customers and prospective customers during the term of the Agreement;

     d.     secure from RB USA approval to sell any assets or inventory; and

     e.     for a period of two years from termination, to refrain from operating an entity which sells products competitive with Roche Bobois.

54.     Upon termination franchisees have existing contractual obligations with customers, which they will be unable to honor as a result of this wrongful termination.

55.     The Massachusetts Franchise Agreement precludes Ms. Gaubil, individually, from engaging in competitive activity for the duration of the Agreement and for two years from termination or expiration of the Agreement.  The Napa and Icora Franchise Agreements contain identical prohibitions.

56.     RBI, by its conduct as a shareholder of Viva, is seeking to effect a "freeze out," removing Ms. Gaubil from office, terminating her employment, and depriving her of the benefit of her equity interest in Viva.

57.     RBI, by its conduct, is seeking to gain complete (100%) control of Viva and its subsidiaries, and the Roche Bobois stores without paying reasonable compensation for the same.

58.     RBI, by its conduct as a shareholder of Viva, and by exerting its control over RB USA, its wholly owned subsidiary, seeks to preclude any opportunity to cure the alleged defaults.

<u>RBI Improperly Interferes with Viva's Supplier Relationships</u>

59.     RBI knows that the financial condition of Viva and its subsidiaries has substantially improved in the first quarter of 2010 and that it is on good terms with its suppliers. RBI also knows that Ms. Gaubil, as an officer and shareholder of Viva, loaned Icora $100,000 so that the orders to the suppliers would be fulfilled in the ordinary course of business.

60.     Recently, however, Ms. Gaubil, in her capacity as President of Viva, received notice that after RBI attempted to cause Ms. Gaubil to transfer her interest in Brava to RBI for little or no consideration, RBI contacted a major Viva supplier and demanded that such supplier

refuse to continue to ship product to Viva and its subsidiaries unless Viva and its subsidiaries

paid in advance, something they were not otherwise required to do.

## The Board Meetings

61.     Two days after RB USA noticed termination of the Massachusetts, Icora and

Napa Franchise Agreements, on April 7, 2010, RBI recognized and acknowledged to Viva and

its subsidiaries that it controls the Boards of Directors of Viva and Brava and could therefore

achieve its goal of wresting control of Brava from Ms. Gaubil without necessarily resorting to

the extreme measure of termination of the Franchise Agreements.  As a result, RBI expressed

that it was considering calling a Board of Directors meeting for Brava and voting Ms. Gaubil out

of the position of President as an alternative to causing RB USA to proceed with the termination

of each of the franchises.

62.     On or about April 10, 2010, the day after Ms. Gaubil and Viva and its subsidiaries

commenced this action by filing a Verified Complaint in the Massachusetts Superior Court on

behalf of herself, individually, and as President of Viva and its subsidiaries, RBI, through

Messrs. Roche and Bonan, caused a Board of Directors meeting for Viva to be noticed to take

place on April 13, 2010.  Attached hereto and incorporated herein as Exhibit "C" is a true and

accurate copy of said notice.  The alleged purposes of the meeting were "to review the financial

and business situation of the company, the unpaid obligations to creditors and to determine how

to respond to the default notices under the [Franchise Agreements]."  Notably, pursuant to the

default notices and Franchise Agreements, the franchises would be terminated effective April 12,

2010 absent the cure of all alleged defaults, thereby rendering moot any discussion by the

directors to have taken place on April 13, 2010 concerning a response to the default notices.

63.     In any event, the Viva Board of Directors meeting was not held on April 12, 2010. Instead, the parties agreed to adjourn the meeting and entered into a Stipulation that RBI and RB USA would not terminate the franchises or Ms. Gaubil's employment provided certain conditions were met and pending the outcome of the parties' efforts to resolve the issues raised in connection with this action.

64.     On or about May 6, 2010, the Court held a hearing on Applications for Preliminary Injunction filed by Ms. Gaubil and Viva and its subsidiaries.

65.     Subsequently, while the Applications for Preliminary Injunctions were pending, RBI caused the Board of Directors meeting for Viva to be rescheduled for and to take place on May 18, 2010. During that meeting, the RBI-controlled directors, Messrs. Roche and Bonan, voting against Ms. Gaubil in each instance, resolved, among other things:

a.      To remove Ms. Gaubil as President of Viva and replace her with Mr. Bonan, and to elect Messrs. Roche and Gleize to fill other officer-level positions within the company;

b.      To require that meetings of the Boards of Directors of each of Viva's subsidiaries be held forthwith for the purposes of removing Ms. Gaubil as President and replacing her with Mr. Bonan, as well as appointing Messrs. Roche and Gleize to fill various other officer-level positions;

c.      To terminate Viva's representation by its then-counsel (also its counsel in this action) and to cause Viva to withdraw from and discontinue its involvement in this action; and

d.      To require that meetings of the Boards of Directors of each of Viva's subsidiaries be held forthwith for the purposes of terminating the

subsidiaries' representation by their then-counsel (also their counsel in this action) and to cause the subsidiaries to withdraw from and discontinue their involvement in this action.

66.     Although Ms. Gaubil technically remained employed by Viva and its subsidiaries following the May 18, 2010 meeting, RBI, through the RBI-controlled Directors, communicated its intent to terminate Ms. Gaubil's employment with the entities.  In this regard, the Directors communicated to Ms. Gaubil that Antonin Roche would replace her as the manager of the Brava stores in Boston and Natick, and that Julian Bigan, an individual with only three (3) months experience with the Roche Bobois brand, would replace her as the manager of the Napa and Icora stores in Florida.

67.     On June 1, 2010, meetings of the Boards of Directors of Viva's subsidiaries were held, at which the respective Boards, a majority of each of which were controlled by RBI's agents, Messrs. Roche and Bonan, voted to adopt resolutions similar to those made at the May 18 Viva Board meeting.

68.     Specifically, Ms. Gaubil has been removed as officer of any of Viva's subsidiaries.  Her employment by Brava and the Florida stores was terminated on June 4 and June 10, respectively.

69.     Messrs. Roche and Bonan also noticed a Special Meeting of the Board of Directors for Diva for September 30, 2010.  The purpose of the meeting was "to review the financial and business situation of the Corporation, to remove and elect officers, to designate a new statutory agent and registered office, to change signatories on bank accounts," and other actions deemed necessary by the Board.  A true and accurate copy of the Notice of the Special Meeting of the Board of Directors of Diva is attached hereto as Exhibit D.

70.     Ms. Gaubil objected to the meeting and did not attend but did communicate her opposition to the proposed resolutions.  Over her objections, Messrs. Roche and Bonan: (i) voted out the officers of Diva and changed all bank signatories; (ii) installed Mr. Bonan as President and CEO of Diva, Mr. Roche as Chairman of the Board and Treasurer, and Mr. Gleize as Secretary; and (iii) made Messrs. Roche, Bonan, and Gleize the sole signatories on all corporate bank accounts.

71.     Ms. Gaubil was removed as an officer and director of Diva and her employment as manager was terminated effective immediately.

72.     The rationale for removal and termination was pretextual.

73.     Defendants allege that Ms. Gaubil mismanaged the Diva store.  That allegation is false.  She has operated the Diva store profitably.

74.     Defendants also allege that Ms. Gaubil removed inventory for personal use.  That allegation is false.  Inventory is accurately reported.

### The Notices Of Termination Of The Franchises Remain Extant

75.     Although the Massachusetts and Florida franchises have not been terminated, the notices of termination have not been revoked or withdrawn.

76.     RBI recognizes the extreme harm likely to result to Ms. Gaubil and Viva from termination of the franchises which inures entirely to the benefit of RBI and to the complete disadvantage of its fellow shareholder.

77.     The net effect to Ms. Gaubil of the termination of the Massachusetts, Icora and Napa Franchise Agreements would be to render her interest in Viva and its subsidiaries valueless.

78.     In contrast, by directing its wholly owned subsidiary RB USA to terminate the franchises, RBI would be able to immediately issue new franchise agreements to itself or to an entity owned by it and therefore own and or control 100% of the stores previously owned and operated by Viva and its subsidiaries.

79.     Ms. Gaubil would be deprived of a right to earn a livelihood.  But for RBI's and RB USA's improper conduct, Ms. Gaubil had a reasonable expectation of continued employment.  Now, she would be precluded from working in an industry to which she has been completely committed for more than thirty (30) years.  Her reputation in the industry would be tarnished if not destroyed entirely.  Her contributions to the business in Massachusetts would be rendered worthless.

80.     Ms. Gaubil would suffer further irreparable harm if RBI is permitted to cause RB USA to terminate the Massachusetts, Icora and Napa Franchise Agreements.  The loss to Ms. Gaubil of her interest in Viva and its subsidiaries is not measurable because the amount of damages would be contingent on Viva's future earnings and distributions.

<u>Harm To Ms. Gaubil From The Termination Of Her Employment</u>

81.     Because the Massachusetts, Icora and Napa Franchise Agreements have not been terminated, Ms. Gaubil is subject to a non-competition restriction of indefinite duration and unlimited geographic scope.

82.     RBI's removal of Ms. Gaubil from her employment by the franchises while they remain in operation, contrary to the express representations contained in the Massachusetts, Icora and Napa Franchise Agreements, will result in substantial economic harm to Ms. Gaubil.

83.     Ms. Gaubil has satisfied all conditions precedent to the commencement of this action.

## COUNT I

### (Breach of Fiduciary Duty Against RBI)

84.     Ms. Gaubil repeats, realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

85.     As a fifty percent (50%) shareholder in closely held corporations, RBI owes Ms. Gaubil a fiduciary duty of utmost good faith and loyalty.

86.     RBI's actions in causing its wholly-owned entity, RB USA, to issue a notice of termination of the Massachusetts, Icora and Napa Franchise Agreements because Ms. Gaubil refused to cede management control of Brava to an RBI-controlled entity and refused to transfer her interest in Brava to RBI for little or no consideration, are self-interested and harmful to Brava and the Florida Entities.

87.     By causing its wholly-owned entity, RB USA, to issue a notice of termination of the Massachusetts, Icora and Napa Franchise Agreements because Ms. Gaubil refused to cede management control of Brava to an RBI-controlled entity and refused to transfer her interest in Brava to RBI for little or no consideration, RBI as a shareholder of Viva committed a breach of its fiduciary duty to Ms. Gaubil, the other shareholder of Viva.

88.     By causing its agents to terminate Ms. Gaubil's employment with Brava and the Florida Entities and to strip her of her title as President of each of these entities, RBI has committed a breach of its fiduciary duty to Ms. Gaubil.

89.     By causing its agents to terminate Ms. Gaubil's employment with Diva and to strip her of her title as President, RBI has committed a breach of its fiduciary duty to Ms. Gaubil.

90.     As a direct and proximate result of RBI's breaches of fiduciary duty, Ms. Gaubil has suffered and continues to suffer damages in an amount to be proved at trial.

## COUNT II

### (Breach of Contract Against RBI)

91.     Ms. Gaubil repeats, realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

92.     The Massachusetts Franchise Agreement constitutes a contract.

93.     Pursuant to the Massachusetts Franchise Agreement, Ms. Gaubil is required to serve as President of the Massachusetts franchises, and to have full managerial authority and responsibility for the operation and management of the Massachusetts franchises for the duration of the Massachusetts Franchise Agreement.

94.     By causing its agents to remove Ms. Gaubil from her position as President of Viva and Brava and to terminate her employment with the Massachusetts franchises, RBI committed a breach of contract.

95.     Pursuant to the Franchise Agreement awarded to Diva, Ms. Gaubil is required to serve as President of Diva, and to have full managerial authority and responsibility, together with Henri Gaubil as Treasurer and Secretary and David Zein as Vice President, for the operating management of Diva for the duration of the Franchise Agreement.

96.     By causing its agents to remove Ms. Gaubil from her position as President of Diva and to terminate her employment with the D.C. franchise, RBI committed a breach of contract.

97.     As a direct and proximate result of RBI's breach of contract, Ms. Gaubil has suffered and will continue to suffer harm in an amount to be proved at trial.

## COUNT III

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against RBI)

98.     Ms. Gaubil repeats, realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

99.     The Massachusetts and Diva Franchise Agreements carry with them the implied covenant of good faith and fair dealing, running from RBI to Ms. Gaubil.

100.    The conduct of RBI, as described above, constitutes a material breach of the implied covenant of good faith and fair dealing, and serves to deprive Ms. Gaubil of the fruits of the Massachusetts and Diva Franchise Agreements.

101.    As a direct and proximate result of this breach of the implied covenant of good faith and fair dealing, Ms. Gaubil has been harmed in an amount to be determined at trial.

## COUNT IV

### (Declaratory Judgment Against RBI Re:  January 30 Document)

102.    Ms. Gaubil repeats, realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

103.    An actual controversy exists among the parties, and a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this action.

104.    Ms. Gaubil signed the January 30 Document under duress, or while subjected to undue influence, rendering the Document void or voidable.

105.    The express language of the January 30 Document evidenced that it was intended to be a preliminary expression of the parties' interest in a transaction, and that the parties' intended that further interpretation, restating and/or revising would be required before the terms

would rise to the level of an enforceable a contract.   The January 30 Document is in essence and, at best, an "agreement to agree."

106.     By reason of the foregoing facts, an actual controversy exists within the meaning of M.G.L. c. 231A, §1 between Ms. Gaubil and RBI with respect to their rights, status and other legal relations relating to the two-year post-employment restriction contained in the January 30 Document which RBI claims is enforceable.

107.     The entry of a declaratory judgment in this case will terminate the controversy giving rise to this action and settle the rights and obligations and afford relief to the parties and fix their status and legal relations regarding the Document.

<u>**COUNT V**</u>

<u>(Declaratory Judgment Against RBI And RB USA Re:  Non-Competition Restriction in Franchise Agreements)</u>

108.     Ms. Gaubil repeats, realleges and incorporates by reference all prior paragraphs of this Complaint as though fully set forth herein.

109.     An actual controversy exists among the parties, and a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to this action.

110.     The employment non-compete provisions contained in the Massachusetts and D.C. Franchise Agreements, which is of unlimited duration and geographic scope, does not protect a legitimate business interest of RBI or RB USA, is overbroad in its restrictions, and unlawfully precludes Ms. Gaubil from earning a livelihood.

111.     The employment restriction – of unlimited duration and geographic scope – in the Massachusetts and Diva Franchise Agreements is wrongfully designed to prevent ordinary competition.

112.    The unlimited post-employment restriction in the Massachusetts and Diva Franchise Agreements is not enforceable to preclude Ms. Gaubil from selling or distributing products competitive with RBI's wholly-owned subsidiary, RB USA.

113.    RBI's material breach of the Massachusetts and Diva Franchise Agreements, in the form of its wrongful termination of Ms. Gaubil, excuses Ms. Gaubil from any further performance, including performance of any post-employment restrictions contained in the Massachusetts and Diva Franchise Agreements.

114.    By reason of the foregoing facts, an actual controversy exists within the meaning of M.G.L. c. 231A, §1 among RBI, RB USA and Ms. Gaubil with respect to their rights, status and other legal relations relating to unlimited post-employment restriction contained in the Massachusetts and Diva Franchise Agreements.

115.    The entry of a declaratory judgment in this case will terminate the controversy giving rise to this action and settle the rights and obligations and afford relief to the parties and fix their status and legal relations regarding the Massachusetts and Diva Franchise Agreements.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Ms. Gaubil requests:

1.    That RBI be preliminarily restrained and subsequently enjoined from (i) causing its wholly owned subsidiary, RB USA, to terminate the Massachusetts, Icora and Napa Franchise Agreements; and (ii) interfering with Viva's and Diva's and its subsidiaries' relationships with suppliers;

2.    That this Court enter Judgment in Ms. Gaubil's favor and against Defendant RBI on Counts I, II and III of the Complaint and award Ms. Gaubil damages, including interest and costs;

3.      That this Court enter Judgment in Ms. Gaubil's favor and against RBI on Count

IV of the Complaint and declare that the January 30 Document is void or unenforceable, or that

the January 30 Document does not constitute a contract;

4.      That this Court enter Judgment in Ms. Gaubil's favor and against RBI and RB

USA on Count V of the Complaint and declare that the post-employment restrictions in the

Massachusetts and Diva Franchise Agreements are unenforceable, and/or that Ms. Gaubil is

excused from any performance of those restrictions by virtue of RBI's material breach; and

5.      For such other and further relief as this Court shall deem just and proper,

including costs, disbursements and reasonable attorneys' fees.

DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,
Plaintiff,
VIVIANE CORIATT-GAUBIL,
By her attorneys,


 /s/ James E. O'Connell, Jr.
James E. O'Connell, Jr., BBO# 376475
joconnell@pbl.com
Jennifer A. Yelen, BBO# 565205
jyelen@pbl.com
Posternak Blankstein & Lund LLP
Prudential Center
800 Boylston Street
Boston, Massachusetts  02199
(617) 973-6100

Dated: November 17, 2010

## CERTIFICATE OF SERVICE

I, Jennifer A. Yelen, counsel for the Plaintiff Viviane Coriatt-Gaubil, hereby certify that on the date first-above written, a true copy of the foregoing document was filed electronically with the U.S. District Court, District of Massachusetts, and served upon all attorneys of record in this matter by the ECF electronic notification system.

/s/ Jennifer A. Yelen
Jennifer A. Yelen

## VERIFICATION

I, Viviane Coriatt-Gaubil, Plaintiff in the above-captioned matter, have read the attached Second Amended Verified Complaint and hereby verify that the facts stated therein are true and based upon my own personal knowledge, information and/or belief and, insofar as they are based upon information and belief, I believe them to be true.

Signed this ___15___ day of November, 2010 under the pains and penalties of perjury.

_____
Viviane Coriatt-Gaubil